1               IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4  RUSSELL F. NELMS                §      CASE NO. 22-03315-ADV
                                    §      HOUSTON, TEXAS
5  VERSUS                           §      WEDNESDAY,
                                    §      FEBRUARY 1, 2023
6  ELECTRIC RELIABILITY COUNCIL     §
   OF TEXAS, INC.                    §      8:59 A.M. TO 10:45 A.M.
7

8
                          **MOTION TO DISMISS**
9
                  BEFORE THE HONORABLE MARVIN ISGUR
10                 UNITED STATES BANKRUPTCY JUDGE

11

12

13
        APPEARANCES:                      SEE NEXT PAGE
14
          (RECORDED VIA COURTSPEAK; NO LOG NOTES)
15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 Eldridge Road, #144
22                  Sugar Land, TX  77478
                       281-277-5325
23              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                              APPEARANCES:

2

3  FOR RUSSELL F. NELMS:              MAZIN A SBAITI
                                      KEVIN COLQUITT
4                                     SBAITI & COMPANY PLLC
                                      J.P. MORGAN CHASE TOWER
5                                     2200 ROSS AVENUE
                                      SUITE 4900W
6                                     DALLAS, TX 75201
                                      214-432-2899
7

8

9  FOR ELECTRIC RELIABILITY
   COUNCIL OF TEXAS, INC.:            JAMIL N ALIBHAI
10                                    MUNSCH HARDT KOPF
                                      & HARR, PC
11                                    500 N AKARD STREET
                                      SUITE 3800
12                                    DALLAS, TX 75201
                                      214-855-7500
13

14

15

16  (Please also see Electronic Appearances.)

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 1, 2023; 8:59 A.M.**

2          THE COURT:  All right, good morning.  We are here

3  in the Nelms versus ERCOT Adversary Proceeding, 22-03315.

4  We'll take appearances here in the Court, if you would, come

5  forward to the podium.  We'll then take any appearances on

6  the phone.

7          MR. SBAITI:  Good morning, Your Honor.  My name is

8  Mazin Sbaiti.  I'm here for the Plaintiff, Russell Nelms, as

9  Plan Administrator for Griddy Energy, LLC.

10         THE COURT:  Thank you.  Good morning, Mr. Sbaiti.

11         MR. SBAITI:  Good morning.

12         THE COURT:  Alibhai, good morning.

13         MR. ALIBHAI:  Good morning, Your Honor.  Jamil

14  Alibhai at Munsch Hardt on behalf of ERCOT.  I'm joined by

15  John Cornwell, Tony Anderson, and Jordan Curry, and also

16  appearing by video is ERCOT's Assistant General Counsel,

17  Randy Gleeson (phonetic).

18         THE COURT:   Thank you.

19         Good morning, Mr. Gleeson.

20         If anyone wishes to speak on the phone as opposed

21  to just listen, can I get you to press 58 one time on your

22  phone, please?

23         From area code 214-432-2899, who do we have?

24         MR. COLQUITT:  Good morning, Your Honor, this is

25  Kevin Colquitt.  I'm appearing on behalf of Griddy.  I'm co-

1   Counsel with Mr. Sbaiti, and I will be attempting to run the

2   PowerPoint remotely.

3           THE COURT:  Mr. Colquitt, I will make you the

4   presenter, and I'm going to leave your voice active.  You

5   might want to mute your own line just to be sure you're not

6   making a bunch of background because that way, in case you

7   need something, you can just speak up.

8           MR. COLQUITT:  Yes, Your Honor.

9           THE COURT:  So, I just wanted to tell everybody

10  where I start today's hearing because I think it's usually

11  helpful that you're not unfamiliar with where I am.

12          First, I don't believe that the force majeure

13  issue has been fully addressed in the papers with respect to

14  abstention issues, and I really don't think it matured until

15  we got the proposed First Amended Complaint, but I need to

16  understand how the force majeure issue should be treated by

17  the Court.

18          For example, if we were to abstain and the State

19  Court were to determine that the claims by ERCOT are not

20  permitted, it seems to me force majeure would be moot.  But

21  if the State Court were to determine the claims were

22  permitted, then I don't know why abstention would apply to

23  force majeure.  But again, I don't think that it was fully

24  on the table with respect to the Complaint that we are here

25  on, but it leaves me wondering about that issue more than

1   maybe most.

2        Second, I currently read -- and I'm completely

3   willing to listen to arguments I'm wrong, but the *Just*

4   *Energy* would require me to abstain on this proceeding as to

5   whether ERCOT properly imposed the $9600 rate.  Other issues

6   will flow from that determination by the State Court, for

7   example, you know, what occurs with respect to the allowance

8   of a claim in the bankruptcy case, whether something is a

9   preference, all of those other issues.  And I believe,

10  starting today's hearing, that I would have the authority to

11  abstain just on that one question, and then abate the rest

12  of the proceeding to see how the State Court ruled.

13        Maybe people disagree with the authority that I

14  think I have, and I want to hear about that.

15        And obviously, Mr. Sbaiti, I know that that

16  primary ruling is something that you want to argue against,

17  and I'm fully inviting you to do that.  I'm telling you

18  where I start the hearing, not necessarily where I'll end

19  the hearing.  But I want to focus you so that you know at

20  least the portion of this that I'm very concerned about --

21  and I understand this is just applying one of the factors.

22        But when you look at Page 18 of the 5th Circuit's

23  opinion in *Just Energy*, it's pretty specific that part of

24  the adjudicatory structure of the State is for the State

25  Court to determine whether ERCOT complied with the PUCT's

1   rules and orders.  And I think the core of your Complaint

2   largely is that PUCT didn't really tell ERCOT what to do.

3   They told them to act in accordance with these guidelines,

4   and then ERCOT overstepped its bounds.

5          I'm reading the 5th Circuit is saying that part of

6   the State process is to figure out whether they overstepped

7   their bounds, and that's the particular page in context that

8   I'm worried about and I wanted to just tell you that right

9   from the beginning so that your arguments could be properly

10  focused.

11          That said, Mr. Alibhai, it's your motion.

12      (Pause in proceedings.)

13          THE COURT:  Good morning, again.

14          MR. ALIBHAI:  Good morning.

15          May I approach?

16          THE COURT:  Of course.

17      (Mr. Alibhai approaches Court and provides documents.)

18          THE COURT:  These are souvenirs of what we're

19  going to see on the screen; is that right?

20          MR. ALIBHAI:  Yes, Your Honor.

21          THE COURT:  Okay, I'll try and watch the screen,

22  but I appreciate having that to take back with me.

23          MR. ALIBHAI:  May I request that Jordan Curry be

24  the presenter for our presentation?

25          THE COURT:  I think I made Mr. Colquitt -- do you

1  want --

2          MR. ALIBHAI:  He's with Mr. Sbaiti's firm.

3          THE COURT:  I'm sorry.

4          MR. ALIBHAI:  Jordan Curry.

5          THE COURT:  I apologize.  My fault.

6          MR. ALIBHAI:  That's all right.

7      (The Court coughs.)

8          THE COURT:  In case I make you nervous, my doctor

9  says I'm not contagious, and this is a 6-week-old aftermath

10 from having had COVID, but that I'm reasonably safe, or I

11 think completely safe to be around people.  But I'm sorry

12 about coughing.

13          Okay, Mr. Curry, you want to be presenter at this

14 point, or Ms. Curry, I apologize.

15          MR. ALIBHAI:  So, Your Honor, with respect to the

16 issues that you raised this morning, the issue of the force

17 majeure -- and I agree that it's -- in my view, we're here

18 on the originally filed Complaint.  The Plaintiff needs

19 leave to file an Amended Complaint and, in our view, would

20 need to show why some of these doctrines that we've

21 addressed don't still apply, and thus, it would be a futile

22 amendment.  And specifically, I'm referring to the *Fabre*

23 (phonetic) doctrine and *Burford* (phonetic) abstention under

24 *Just Energy,* but --

25          THE COURT:  So, I just -- I do think they imply,

1   and it's not very specific -- that their Original Complaint

2   encompasses this issue even without stating it directly.

3   That may be accurate, may not be accurate.  I'm willing to

4   listen to arguments about that.  I don't really want to come

5   back on this question if we can address it today.

6          MR. ALIBHAI:  Certainly.

7          THE COURT:  But if you're not prepared to address

8   it today, I will come back on that question.

9          MR. ALIBHAI:  No, no, I --

10          THE COURT:  I don't mean to surprise you with it

11   either.

12          MR. ALIBHAI:  No, I understand the way that

13   they're claiming that it was there, but to me, it's a

14   contractual issue because the provision that we're looking

15   at is in the SFA about the force majeure.

16          THE COURT:  I think they agree that it's a

17   contractual issue as to whether there was an applicable

18   force majeure, right?

19          MR. ALIBHAI:  But this is not a regular contract

20   between private parties.  This is a regulated contract that

21   is part of the protocols, which this Court has recognized

22   are state law.  And so, the issue that they're raising --

23   first of all, I think Your Honor could easily read this

24   sentence of Section 8(b)(2) of the SFA and say, "That's

25   fantastic.  Whether there was a force majeure event or not,

1   it does not ever relieve an obligation to make a payment.

2   You can't ever say under this force majeure clause -- which

3   is how you have to look at it.  There's no general force

4   majeure law in Texas.  You have to have a contractual

5   provision.

6           THE COURT:  No, no, there -- you probably know

7   I've written pretty extensively on force majeures.

8           MR. ALIBHAI:  Exactly, but this one's very

9   specific and --

10          THE COURT:  Yeah, but I think what it says -- tell

11  me I'm wrong.  It says you can't terminate as a result of a

12  force majeure.  It doesn't say you can't, you know, sue for

13  nonpayment, but you-all terminated it as a result of the

14  force majeure.  And maybe you had the right to do that, but

15  the issue is:  Is that something over which I would need to

16  abstain or should best abstain, or should that wait and we

17  see what happens in State Court with respect to whether you

18  have an allowed claim or not?

19          MR. ALIBHAI:  The only reason that I would lean

20  towards abstention is to be intellectually honest about the

21  *Just Energy* opinion, which is saying that to the extent that

22  we're talking about whether ERCOT followed the protocols, is

23  an issue that should be left to the State Court.  And this

24  is an issue that also is a --

25          THE COURT:  It says whether they complied with the

1  PUCT's rules and orders, not whether they complied with

2  their own protocols.  I really do -- I will follow *Just*

3  *Energy* precisely, but I want to be careful what I'm doing,

4  and I don't know from the logic of *Just Energy,* much less

5  the language, why a force majeure would be included.  Maybe

6  that's because there are some PUCT orders that deal with

7  force majeure issues, for example, but if not -- and this

8  doesn't involve PUCT at all, it's just a private contractual

9  dispute -- maybe it should be here that maybe we're

10 premature on dealing with it until we figure out if there's

11 an amount owed or not.

12        I don't know.  That's why I wanted to hear that.

13        MR. ALIBHAI:  Sure, and I have a different copy of

14 the *Just Energy* opinions.  It's the one from Westlaw, now.

15        THE COURT:  Okay.

16        MR. ALIBHAI:  But it's --

17        THE COURT:  Well, I'm on Page 8 of the *Exler*

18 (phonetic) original opinion, which it's a paragraph that

19 starts, "The State Court is well equipped to adjudicate *Just*

20 *Energy*."

21        MR. ALIBHAI:  Sure, and the part that I was

22 referencing, it's a couple of paragraphs before the

23 conclusion.

24        THE COURT:  Okay.

25        MR. ALIBHAI:  And it starts with, "Texas selected

1    the Travis County District Court," and it's the --

2              THE COURT:  Yes, I got that.

3              MR. ALIBHAI:  They talk about the question that

4    needs to be answered, and they said, "Did ERCOT charge a

5    lawful filed-rate calculated in accordance with market-based

6    protocols?"

7              THE COURT:   Uh-huh.

8              MR. ALIBHAI:  And then, they go on to say that's

9    something that can only be answered by the Travis County

10   District Court.

11             And so, the arguments that have been put forth

12   with respect to any compliance with protocols, whether it's

13   regarding to rate, whether it's with respect to applying the

14   force majeure clause, the termination being proper, I

15   believe that *Just Energy*'s opinion would encompass the idea

16   of compliance with protocols because that's a Texas state

17   law.

18             THE COURT:  Well, but I think when you read back

19   to the very beginning of the opinion and where it talks

20   about what the dispute is, the dispute that it's addressing,

21   and therefore -- I mean, maybe it meant anything about its

22   protocols has to go to State Court.  I doubt it.  They're

23   ruling on the dispute they had before them.

24             The dispute that they had before them was whether

25   ERCOT properly implemented PUCT orders, and if ERCOT did

1 | properly implement the PUCT orders, whether it did is a

2 | question for the Travis State Court.  I have a hard time

3 | thinking that they were saying that that would apply to

4 | facts not necessarily before them.  I mean, maybe that's

5 | what they're saying, but --

6 |          MR. ALIBHAI:  Well, I'm familiar with the *Just*

7 | *Energy* Complaint, and the Court can take judicial notice of

8 | it.

9 |          THE COURT:  I'm sure you are, yeah.

10 |          MR. ALIBHAI:  And it is summarized here, but the

11 | Court -- and this is the first pages of the opinion where

12 | they're --

13 |          THE COURT:  Right.

14 |          MR. ALIBHAI:  -- discussing the case, and they

15 | say, "Just Energy challenges its invoice obligations

16 | because, among other things, the invoices are based on the

17 | PUCT orders which, themselves, are unlawful under the

18 | APA" --

19 |          THE COURT:  Right.

20 |          MR. ALIBHAI:  -- "and the PURA, and otherwise are

21 | inconsistent with ERCOT protocols and the standard form

22 | Market Participant Agreement."

23 |          And so, as I was reading the arguments being made

24 | by the other side as they were trying to make these

25 | amendments and trying to back off from the PUCT orders

1  issue, whether it's that we didn't comply or did comply with

2  the order, or whether the order was applicable or not

3  applicable, or whether we didn't comply with the protocols

4  -- because everyone tries to say, "Well, if you comply with

5  the protocols, the price would have different, and it's your

6  failure to comply with the protocols that we're

7  challenging."

8           THE COURT:  Right.

9           MR. ALIBHAI:  Just Energy did that, Griddy's doing

10 that, and however --

11          THE COURT:  But all of that was with respect and

12 limitations to the orders, but maybe I need to go back

13 because I've not gone back to look at the *Just Energy*

14 Complaint.

15          Did the *Just Energy* Complaint ever raise or

16 anything else in the case ever raise a provision to

17 protocols unrelated to the orders, i.e. the force majeure,

18 or something similar to that?

19          MR. ALIBHAI:  Yes, it raised that load shed was

20 not in the protocols and that the pricing mechanisms in the

21 protocols would have yielded a different price.

22          THE COURT:  Correct, but that was in the face of a

23 PUCT order that said, "Effectively take into account load

24 shed," right?  And so, I think when the 5th Circuit's

25 looking at it, if the protocols and the orders, those are

1   all intertwined issues that deal with how you implement this

2   order.  Therefore, they're saying Travis County Court has to

3   deal with it.

4          But something unrelated to that -- I'm assuming

5   because -- the forced majeure issue only matters if you guys

6   win at State Court, right?  I think if you lose at State

7   Court, probably it doesn't apply.  There could be a mixed

8   win, and I got that, but if you weren't allowed to impose

9   the rate according to the State Court, the force majeure may

10  go away.  If you are allowed to impose the rate, then the

11  PUCT orders are totally vindicated, you applied your

12  protocols in a manner that was okay under the PUCT orders,

13  but nothing about the PUCT order implicates a force majeure

14  provision, I don't think, unless the lawsuit did that.

15         MR. ALIBHAI:  No, and I understand what you're

16  saying about the decision tree as to how it could possibly

17  go.  I think if I'm tracking correctly, what Your Honor is

18  saying is that if we were allowed to charge 9,000, the

19  stepping stone to the force majeure argument for the

20  Plaintiff would be gone because if we were allowed to send

21  the invoice and they didn't pay the invoice that was proper,

22  then --

23         THE COURT:  No, other way.  If you weren't allowed

24  to send the invoice, their force majeure issue is moot

25  because they don't owe you the money if that's what the

1  State Court determines.

2          MR. ALIBHAI:  Well, the other issue they're

3  raising is, "You shouldn't have terminated us when we didn't

4  pay the invoice.  That was an improper invoice."

5          THE COURT:  Yeah, and let's assume that the State

6  Court says it was an improper invoice.  We don't need to

7  worry about force majeure, right?

8          MR. ALIBHAI:  Well, I'm not sure about that

9  because as I'm thinking through the two different ways, I

10  don't know what -- look, I don't know what belief they would

11  seek in the State Court. Nobody's done it right now except

12  for the challenges to the orders themselves pending in the

13  Court of Appeals.

14          So, when people that follow the abstention ruling

15  and file a State Court proceeding -- you know, are they

16  going to get retroactive relief?  I don't know how it would

17  work, and that's why when Your Honor said --

18          THE COURT:  I don't either.

19          MR. ALIBHAI:  -- it might be moot, I'm not sure

20  that the Court would possibly say, "Hey, just because you

21  did this doesn't mean that you're wrong at the time.  Here's

22  what you have to do today, but it doesn't mean that we're

23  going to undo everything."  I'm not sure that that happens.

24          THE COURT:  More than fair, and maybe my comment

25  went too far.

1    Let's assume for a moment though that Griddy sues

2  in Travis County State Court, and their suit is totally

3  against ERCOT not against PUC, and alleges that ERCOT, in

4  adopting the $9600 rate, did not comply with the PUCT orders

5  and that the State Court says, "The invoices are invalid and

6  you may not charge them."

7    Under that event, i.e. a total win for Griddy at

8  State Court, the force majeure issue becomes moot because

9  there are no invoices that they're not paying as a

10  consequence of force majeure.  If, on the other hand, they

11  lose just as soundly as I've described that they might win

12  and the full invoices are upheld by the Travis County Court,

13  then they would be asserting a force majeure that says you

14  couldn't terminate service, but you did and you did that in

15  violation of the protocols.

16    MR. ALIBHAI:  And I think it's not as binary as

17  you and I are possibly thinking about it because --

18    THE COURT:  I agree.  That's why I'm taking back

19  my original comment, yeah.

20    MR. ALIBHAI:  Well, as you said that, again, I

21  thought about the fact there's no doubt that they owed

22  something and didn't pay.  What the amount was may be in

23  dispute, but there's something that they owed and didn't

24  pay.  They were in default -- even if, today --

25    THE COURT:  Right.

1          MR. ALIBHAI:  -- Your Honor said, "I'm dropping

2    the rate to .3 percent like they asked," -- not that you

3    would do that, but let's say you did that -- they're in

4    breach.  They haven't paid that amount.  So, because there's

5    $29 million of invoices that are outstanding.

6          THE COURT:  Yeah.  Actually, I don't know under

7    Texas law where if you tell them, "You owe us $300 million,"

8    and they actually owed you $30 million, I'm not sure whether

9    they had to pay the 30 or not, or whether they can just sit

10   on it and then pay it later.  I don't know, but you're

11   right.  The choices aren't binary, but the force majeure

12   issue will vary depending upon what a State Court outcome

13   is, I think.

14          MR. ALIBHAI:  I agree.

15          THE COURT:  Okay.

16          MR. ALIBHAI:  I agree with that much.

17          THE COURT:  And I don't know why it's -- and I do

18   understand your argument that's a breadth of some of the

19   language in the 5th Circuit's opinion could encompass these

20   kind of things but I mean, the 5th Circuit's pretty good

21   about holding to facts that they were ruling on and then --

22          MR. ALIBHAI:  Agreed.

23          THE COURT:  -- not being expansive.  And you know,

24   Judge Englehart is in that camp.  So, I'm not terribly

25   worried that that's what -- that I'm not terribly worried

1  that, absent something else in the Complaint that would have

2  invoked different facts, that they intended to describe

3  every possible set of facts that were there.  They're ruling

4  on the facts that were before them.

5          MR. ALIBHAI:  No, and the only reason I bring up

6  the language both from the Complaint in *Just Energy* that's

7  summarized in the *Just Energy* opinion, as well as this issue

8  of whether ERCOT charged a lawful filed-rate calculated in

9  accordance with market-based protocols, is because of the

10  parallel to this case.

11          THE COURT:  Right.

12          MR. ALIBHAI:  Because the argument being made here

13  is if you'd followed your protocols, everything would have

14  been good.

15          THE COURT:  And that's why I'm starting off the

16  hearing saying I think I should abstain at least as to that

17  part.

18          MR. ALIBHAI:  And so, we, obviously, agree with

19  you.  We thought under *Burford* and the *Wilson* case, which

20  had similar facts dealing with the Louisiana Co-Ops, an

21  electricity dispute, mandated abstention, and then of course

22  the Just --

23          THE COURT:  Can I abstain on that part and abate

24  the rest?

25          MR. ALIBHAI:  And you said that.  What did you

1  mean by abstain and -- I mean, to me, abstention means

2  you're staying the case pending a resolution of the State

3  Court proceeding.

4          THE COURT:  I think abstention would -- if I had a

5  narrow lawsuit and I abstain from it, that lawsuit would no

6  longer be before me.  I think though that I can abstain as

7  to one claim within a lawsuit and abate the rest of it, and

8  I wanted to hear your thoughts about that.

9          MR. ALIBHAI:  So, I'm not sure --

10          THE COURT:  So that I would never rule, for

11  example, ever on whether your protocols complied with the

12  PUCT orders, leave that totally to the State Court.  But

13  then once the State Court reached that determination, I

14  could then resume my lawsuit.

15          MR. ALIBHAI:  Correct, but I think there's a few

16  other issues that probably need to be decided in State Court

17  other than just that one.

18          THE COURT:  Like what?

19          MR. ALIBHAI:  The issues that are raised about

20  determination and the polar (phonetic).  I believe that

21  that's an interpretation of the protocols.  And of course,

22  we believe that the claim is improper because there's a --

23          THE COURT:  Yeah, but I --

24          MR. ALIBHAI:  -- there's a -- sorry.

25          THE COURT:  Other than the force -- and I'll let

1   Counsel tell me if I'm wrong -- I think other than the force

2   majeure issue, everything else, all of the other Complaints

3   go away if the bill was proper.  No question.  I don't think

4   that you properly implement polar if force majeure doesn't

5   apply, if the invoices were legitimate.  You may disagree

6   with that, but I think it eliminates all those other

7   questions.

8           MR. ALIBHAI:  If they agree to that, then sure.  I

9   agree with that.  The negligence claim, I think, also raises

10  an issue of interpretation of state law issues as they apply

11  to ERCOT, whether ERCOT owes a duty to --

12          THE COURT:  I don't think you're negligent if you

13  implement something in accordance with the law, right?

14          MR. ALIBHAI:  Correct, but the issue of the duty

15  is the one that I'm more concerned about because I don't

16  think it exists in Texas law anywhere, and the attempt to

17  use it -- and to me, it's not clear from some of this

18  Complaint what exactly is the relief requested.

19          But the fact that you said that, Your Honor,

20  again, leads to the issue that the negligence claim is

21  parroting a contract claim, which is why --

22          THE COURT:  It might be, yeah.

23          MR. ALIBHAI:  -- clearly the economic law's where

24  we have a problem with it.  But so, there's a number of

25  issues with some of these counts that I have a problem with,

1    but if Griddy agrees that the resolution of the proper

2    charging of the rate undoes all those things, then I --

3              THE COURT:  With force majeure.

4              MR. ALIBHAI:  Well, and polar and determination in

5    general.

6              THE COURT:  Does it make some sense to hear

7    whether that's the case or not before you proceed, or what

8    do you want to do?

9              MR. ALIBHAI:  I'm happy to do that.

10             THE COURT:  So, am I misinterpreting your

11   Complaint in any way?  I know that you surely are going to

12   disagree with the concept of that I should abstain on part

13   of it, but --

14             MR. SBAITI:  Thank you, Your Honor.

15             I'd love to answer that question.  My mouth is a

16   bit dry and the fountain outside -- do you all have little

17   cups that I could just pour a little bit of water?  I'm

18   sorry.

19             THE COURT:  Absolutely, we'll get that taken care

20   of.  Do you want to just wait a minute and we'll --

21             MR. SBAITI:  Thank you, Your Honor.

22             THE COURT:  Why don't you just have a seat, get

23   your notes organized?  We'll get you something.

24             MR. SBAITI:  Sorry, Your Honor?

25             THE COURT:  He's going to get you something.  Why

1   don't you have a seat and we'll get it organized?

2            MR. SBAITI:  Oh, thank you, Your Honor.

3            I can answer.  It's just --

4            THE COURT:  Okay.

5            MR. SBAITI:  I don't believe that the State Court

6   determination moots the force majeure.  At least, I'm not

7   sure why it would.

8            THE COURT:  I don't think it does either, but all

9   the other parts.

10           MR. SBAITI:  If I could just maybe walk through --

11           THE COURT:  Okay.

12           MR. SBAITI:  -- how we kind of see the decision

13  tree as Mr. Alibhai described it?  In a world where they get

14  100% of their claim that there's a $30 million bill and they

15  get to stand on that, we would view that as an offset to the

16  damages for wrongful termination.

17           Let's say they had a $29, 33 million bill that was

18  sent, the contract, as Your Honor pointed out, and he showed

19  you the provision --

20       (Mr. Sbaiti is handed a cup by Court staff.)

21           MR. SBAITI:  Thank you very much.  Thank you.

22           COURT STAFF:  You're welcome.

23           MR. SBAITI:  The contract, if you read the end of

24  that sentence, it says they have a duty to pay except that

25  the force majeure prohibition on declaring the failure to

1    pay as counting as a default, and that's under Section 8(e).

2                THE COURT:  Right.

3                MR. SBAITI:  So, the second we say there's been a

4    force majeure event, our inability to pay, if it's due to

5    the force majeure, takes it out of the realm of a default.

6    And once it takes it out of the realm of a default, it takes

7    it out of the list of reasons that they can terminate the

8    contract which then, in turn, means they can't send all of

9    our customers to a polar.

10               THE COURT:  Right.

11               MR. SBAITI:  That's the logic of the argument.

12   So, if we win down in State Court, if we had to go --

13               THE COURT:  I need you to assume with me for a

14   moment --

15               MR. SBAITI:  Yes, sir.

16               THE COURT:  -- that you lose the force majeure

17   argument because that's the premise on which I was telling

18   Mr. Alibhai.  We don't need to hear the rest of the

19   argument.  If you win your force majeure argument, then it

20   precludes a lot of what they did.

21               MR. SBAITI:  Uh-huh.

22               THE COURT:  If you lose it and you lose at State

23   Court, do you agree that the rest of the consequences,

24   you're going to lose?  You've got to win one of those two

25   arguments in order to prevail on all your other, on any of

1  your other Complaints.

2          MR. SBAITI:  I don't think -- I believe that's

3  true for most of them.  I don't believe that's true for our

4  preference action and I don't believe that's necessarily

5  true for our subordination claim, and I don't --

6          THE COURT:  I don't know why it wouldn't

7  necessarily be true for the subordination claim.  I

8  understand the preference issue.

9          MR. SBAITI:  Well, under the subordination claim,

10  the fact that they -- I guess, if they were entitled to do

11  it, that might reduce the factual basis of the subordination

12  claim, but we think they're --

13          THE COURT:  Why don't I -- if force majeure didn't

14  apply and if this is a legitimate bill, you're not going to

15  get unsubordinated, right --

16          MR. SBAITI:  Fair enough.

17          THE COURT:  -- under 5th Circuit law.

18          MR. SBAITI:  Fair enough.  So, maybe it just comes

19  down to the preference and the administrative claim that

20  don't really turn on either of these questions.

21          May I have a moment to fill my cup?

22          THE COURT:  Yep, and I'm actually let Mr. Alibhai

23  return --

24          MR. SBAITI:  Okay.

25          THE COURT:  -- just now that you've clarified

1  that.

2          And take some time.  If you need some more water

3  or just want to take a break, let me know and we'll do that.

4          MR. SBAITI:  Thank you, Your Honor.

5          THE COURT:  Mr. Alibhai, we interrupted you so

6  that we could get that clarification.  And so, let me get

7  her back as the presenter.

8          Ms. Curry, you're back.

9          MR. ALIBHAI:  So, with respect to the abstention

10  issue, our view is -- and Ms. Curry pointed out another part

11  of the opinion.  And this, Your Honor, is where they're

12  starting the *Burford* analysis.

13          THE COURT:  Right.

14          MR. ALIBHAI:  So, it's under Section B.

15          THE COURT:  Correct.

16          MR. ALIBHAI:  And it's the second paragraph -- oh,

17  sorry.  No, it's not.  They're discussing the second *Burford*

18  factor.

19          THE COURT:  I'm there.

20          MR. ALIBHAI:  It's the paragraph right before the

21  third *Burford* factor.  It starts with, "Here, the marriage

22  of this case" --

23          THE COURT:  Where it says, "but for us to

24  determine whether it was appropriate to disregard the

25  protocols we necessarily" --

1          MR. ALIBHAI:  Yeah.

2          THE COURT:  Yeah, I've got that marked as well.

3          MR. ALIBHAI:  And so, that issue, I believe, that

4  the, you know, same issue applies here.  Whether we

5  disregarded the protocols or second guessing ERCOT's

6  decision-making during an emergency winter storm encompasses

7  the arguments they're making because all of this relates to

8  receiving invoices during the winter storm that the

9  Plaintiff, whether it's Just Energy or it was Griddy,

10  contends were inflated, or artificially high, or not in

11  compliance with the protocols, or due to an order that they

12  didn't follow.

13          THE COURT:  But let's assume they were right.

14  Let's assume your invoices were perfectly correct, what are

15  you telling me that would do to the force majeure issue?

16          MR. ALIBHAI:  That means they fail to pay an

17  invoice that was lawful.

18          THE COURT:  Correct.

19          So, what does that do to force majeure?

20          MR. ALIBHAI:  The failure to pay is not excused

21  even in the circumstances of a force majeure event.

22          THE COURT:  It's not excused, but it's not a

23  default, right?  So, you can sue them, but you can't declare

24  them under default.  I don't understand why that goes to the

25  Travis County Court.

1        MR. ALIBHAI:  I believe -- and I understand what

2   Your Honor is saying about the payment, but it says that in

3   the event of a default, ERCOT may pursue remedies including

4   termination.

5        THE COURT:  It says -- I'm looking at what you

6   have up on the screen -- "except that the excuse from

7   default provided by Subsection 8(a)(5) is still effective."

8        So, it is an excuse from default, right?

9        MR. ALIBHAI:  So, it's referring back to 8(a)(5).

10       THE COURT:  So, let's look up at that.

11       MR. ALIBHAI:  And so, this is Document No. 11-3,

12   it's an exhibit to our Motion to Dismiss.  It has the SFA

13   attached.

14       THE COURT:  So, it's a breach.  You can do things.

15   You just can't default them out.  They still have to pay,

16   but no default.  I just don't know why that goes to Travis

17   County Court.  That would seem to me to be you had a rate.

18   Travis County Court says it was a legitimate rate.  You have

19   the right to charge it.  They didn't pay it.  They allege

20   it's due to a force majeure.  You have the right to

21   challenge whether it was a force majeure, but at that point,

22   haven't we left the whole regulatory scheme and now we're

23   dealing with your contract with them?

24       MR. ALIBHAI:  No, and I don't have it in front of

25   me, but the protocols have also the polar section.  And so,

1  the issue that they're raising about force majeure, you'd

2  also have to examine the protocols about when a polar is

3  required or --

4          THE COURT:  Whether a default is required to

5  invoke polar?

6          MR. ALIBHAI:  Correct.

7          THE COURT:  That makes sense.  We probably need to

8  look at that --

9          MR. ALIBHAI:  Right, and I --

10          THE COURT:  -- but isn't that still -- it's not

11  part of the -- I hate calling it this, but in the broader

12  terms, it's not part of the filed-rate doctrine.  It's not

13  part of the --

14          MR. ALIBHAI:  It's not a filed-rate issue, but

15  it --

16          THE COURT:  It's not part of following the orders.

17  It's just a separate contract.

18          MR. ALIBHAI:  There are multiple market

19  participants whose contracts and agreements with ERCOT, the

20  SFA were terminated who went through a polar because of

21  Winter Storm Uri.

22          THE COURT:  Right.

23          MR. ALIBHAI:  And the interpretation of those

24  provisions during the winter storm -- because it was

25  obviously important to make sure that Griddy's customers had

1   access to electricity, and you know, what'll bear out, if we

2   ever get there one day, is that Griddy asked ERCOT to

3   transfer its customers.

4           THE COURT:  Right.

5           MR. ALIBHAI:  And so --

6           THE COURT:  I remember them telling me that.

7           MR. ALIBHAI:  Right.  And so, ERCOT's compliance

8   with the protocols with respect to polar and its customers

9   is a major part of this Complaint with respect to the claims

10  that they're raising, especially the ones that seek

11  affirmative recovery, and what I heard was that's what they

12  want to do.  They want to seek a recovery greater than

13  $30 million so that even if they owe us $30 million, they

14  want to offset that in the event that they're successful.

15  That's what I'm understanding from what I heard from Counsel

16  for Griddy.

17          So, my view is that the interpretation of what

18  ERCOT was doing during the winter storm with respect to

19  termination and with respect to the transfer of customers

20  that was necessary is a protocol issue.  I agree with you.

21  It's not necessarily they did it pursuant to the PUCT, but

22  it all went in order.  I mean, it's a result of high prices

23  during the winter storm, and some people not paying them,

24  and then the consequences of their failure to pay those

25  invoices that were pursuant to an order and pursuant to a

1   protocol, in our view.

2        THE COURT:  I think I understand that argument.

3   Let me back up a step.

4        Does abstention allow me to abstain as to part of

5   a Complaint, or must I abstain to all or none of a

6   Complaint?

7        MR. ALIBHAI:  I think abstention can be partial.

8   And that's how I read I believe it's Footnote 11 --

9        THE COURT:  In *Just*?

10       MR. ALIBHAI:  -- in *Just Energy*, that the Court

11  affirms this Court's authority to handle the bankruptcy

12  proceeding, but the Travis County Court is the appropriate

13  court to consider the merits of the claims, whether the

14  ERCOT invoices stand, and then after that decision's made --

15  as you're suggesting, I think --

16       THE COURT:  Right.

17       MR. ALIBHAI:  -- that this Court would move

18  forward once those Courts have made those answer.  So, it

19  does assume, and I think general abstention principles

20  assume some type of stay.  I don't think it's a dismissal.

21       THE COURT:  Right.

22       MR. ALIBHAI:  It's an abatement or a stay of the

23  case pending the resolution of the state law issues, and

24  protocol issues, and regulatory issues.

25       THE COURT:  Okay.

1          MR. ALIBHAI:  Conversely, I believe that the

2    filed-rate doctrine is equally applicable and that requires

3    dismissal.  And so --

4          THE COURT:  But only of the parts of the Complaint

5    that go to the filed-rate.

6          MR. ALIBHAI:  Correct, and to the extent that

7    there's any challenge to these invoices, which most of the

8    counts encompass a challenge to the invoices, the filed-rate

9    doctrine would bar, in this Court, that challenge.  They

10   would be able to file a challenge with ERCOT, and appeal to

11   the PUCT, and go to Travis County District Court if the PUCT

12   denied the relief, but they cannot come to a Federal Court

13   and assert a challenge to those invoices.

14          And I think that the *TCE* case that we cite from

15   the 5th Circuit, and even Your Honor's case in *Ultra* where

16   you were dealing with rejection of a contract, and the 5th

17   Circuit says in its opinion that if you were rejecting a

18   contract based upon the rate, that that would be a

19   collateral attack under the filed-rate doctrine and would be

20   prohibited.

21          THE COURT:  So, I know the part you're talking

22   about.  I don't think that's an accurate statement of what

23   they said just so that we all know it, but it's irrelevant

24   largely to what we're doing.

25          You'd mentioned that it goes to PUCT before it

1  goes to Travis County Court?

2         MR. ALIBHAI:  It depends what the challenge is.

3         THE COURT:  I think I don't need to cross that

4  bridge.

5         MR. ALIBHAI:  No, no, no.

6         THE COURT:  Okay.

7         MR. ALIBHAI:  No, no.

8         THE COURT:  I simply would say, if you're correct,

9  I'm going to abstain from ruling on this question, and then

10  allow the parties to figure out how to get that answered --

11         MR. ALIBHAI:  Correct.

12         THE COURT:  -- and I would not direct it to a

13  particular --

14         MR. ALIBHAI:  And as I said, *Just Energy*'s just

15  been decided and there's not been an action filed by that --

16         THE COURT:  Right.

17         MR. ALIBHAI:  -- entity.  So, I don't know what

18  it's going to look like or if they're going to do it.  So,

19  I've not been involved with a situation yet after an

20  abstention but that's --

21         THE COURT:  I doubt the mandate's even issued yet,

22  right?

23         MR. ALIBHAI:  No, the petition for a rehearing was

24  denied yesterday and the mandate issues this month.

25         THE COURT:  Right.

1          MR. ALIBHAI:  So, yeah, it hasn't moved forward

2   yet but with respect to the -- and it's not my prerogative

3   to tell the Plaintiff what they want to file, but it depends

4   on what they want to file and where they want to file it.  I

5   mean, there's a lot of different ways to do these things.

6   As I said, the 3rd Court of Appeals has already heard

7   argument on issues regarding the orders and an opinion is

8   being awaited.

9          THE COURT:  Right.

10          MR. ALIBHAI:  But there's multiple different ways

11   under state law and the protocols to initiate a challenge of

12   certain types, and it depends on which challenge they chose

13   to make.  But I think that this Complaint does -- and I

14   think there's paragraphs that we've cited in the

15   presentation that, number one, make this case a lot like *TCE*

16   because there's this same argument that ERCOT breached the

17   protocols by implementing the pricing that it did, and

18   manipulated and inflated the electricity price, and that was

19   the very issue in the *TCE* case.

20          In fact, there was in the lower court, in the

21   District Court, a claim against ERCOT for breach of contract

22   based upon the failure to follow the protocols, and the

23   Court dismissed it based upon the filed-rate doctrine.

24          And then TXU also had claims against it, and

25   that's what went up on appeal and the Court confirmed the

1    filed-rate doctrine's applicability.

2            But with respect to the 5th Circuit and, you know,

3    the only reference in the *Just Energy* opinion is they say

4    whether, the part that I showed you already, whether ERCOT

5    charged a lawful filed-rate calculated in accordance with

6    the protocols --

7            THE COURT:  Right.

8            MR. ALIBHAI:  -- is the issue that needs to be

9    decided by the State Courts, and we agree that that's an

10   issue that's a State Court issue.  That's not a Federal

11   Court issue.  And the filed-rate -- both abstention and the

12   filed-rate take that into consideration.

13           And so, the proper relief under the filed-rate

14   doctrine is a dismissal of the Complaint or the claims that

15   assert a challenge to the filed-rate.  And then, if there's

16   something left, that certainly would be an abstention issue

17   as well to the extent that it's about the rate that was

18   charged or the invoices that were presented to Griddy.

19           And then, we also believe that Texas state law

20   requires the PUCT to be a party.  And I understand that

21   there's no claim for relief against them, but --

22           THE COURT:  But that would only be really with

23   respect to the part where I'm saying I think I need to

24   abstain --

25           MR. ALIBHAI:  Correct, but if the Court's not

1  abstaining, another ground for dismissal is that the

2  sovereign can't be joined, but they have to be joined under

3  state law.  And the 5th Circuit authority says you can look

4  at state law to make a decision but it's the Government Code

5  2001.038 that says a state agency must be --

6          THE COURT:  Yeah, but in their First Amended

7  Complaint, they make it quite clear that they're not

8  challenging the PUCT rules, as well, so -- or orders.

9          MR. ALIBHAI:  You can delete paragraphs, but you

10  can't change the facts.  I mean, the reality is they're

11  challenging invoices from Winter Storm Uri.  Anyone who

12  lived in Texas is aware that there was an emergency

13  declaration by the Governor, by the President that the PUCT

14  acted in response to those things and issued orders.  I

15  mean, they have to say, "We admit that those orders are

16  valid and that they apply," and they're not saying that.

17  They continue, even in the Amended Complaint, to challenge

18  the applicability --

19          THE COURT:  I don't understand why they have to

20  say they're valid, because they could later sue the PUC

21  about that.  I think they can say, assuming they are valid,

22  ERCOT didn't apply them right, and that does raise the PUC

23  issue.

24          MR. ALIBHAI:  It does because --

25          THE COURT:  If you assume they're valid --

1          MR. ALIBHAI:  Yes.  So, on Slide 15 that's on the

2    screen, 2001.038 says the validity or applicability of a

3    rule may be determined in an Action for Declaratory

4    Judgment, and that's the provision -- and that's I think

5    what's --

6          THE COURT:  I don't think they even challenge when

7    they apply.  They simply say they were misapplied.

8          MR. ALIBHAI:  Well, applicability or

9    inapplicability is part of a challenge that requires a

10   declaratory judgment against the PUCT.

11         THE COURT:  No, I understand the Complaint

12   different than what I'm hearing from you.  Maybe I'm

13   misunderstanding the Complaint.  I think what it's saying

14   is, "We will assume PUCT's orders are correct and must be

15   implemented by ERCOT."

16         ERCOT failed to do that because there was nothing

17   in the order that talked about going to max rate. It simply

18   said take that into account. ERCOT should have taken that

19   into account in a different manner.

20         I don't think that challenges what PUC did.  That

21   may still put it squarely within *Just Energy*, which is a

22   different question.

23         MR. ALIBHAI:  The reason that I think it does is

24   because even in the Amended Complaint, they are stating that

25   ERCOT charged Griddy amounts that were unauthorized under

1  the SFA and the protocols.  It is ERCOT's position that the

2  protocols require it to comply with PUCT orders.

3          THE COURT:  Right, but that's the justification

4  for abstaining not for bringing in PUCT, right?

5          MR. ALIBHAI:  But to the extent that this

6  Complaint continues to argue that even if the orders are

7  assumed to be valid, they don't apply to Griddy.

8          THE COURT:  They didn't say they didn't apply.

9  They said that you acted in an unauthorized way in the

10  manner of your application.

11          MR. ALIBHAI:  I thought there is a paragraph, and

12  I'd have to look at the proposed Amended Complaint, that

13  still makes the allegation about the authority, sorry, the

14  applicability of the orders to the Griddy --

15          THE COURT:  I'll take another look.  And maybe I

16  misread it, but that may not matter.

17          MR. ALIBHAI:  So, those are the three major

18  threshold issues that we believe require either dismissal or

19  abstention.  If you want me to pause there, the other issue

20  -- Ms. Curry believes that it is Paragraph 52.

21          THE COURT:  Of the Amended Complaint?

22          MR. ALIBHAI:  Yes, "Although the PUCT agreed to

23  this request, to the extent that PUCT's considered a state

24  agency, the orders did not apply to Griddy."  That's

25  applicability.

1          THE COURT:  Let me see it.  Hold on.

2      (Pause in the proceedings.)

3          THE COURT:  Paragraph 52 you said?

4          MR. ALIBHAI:  52, yes.

5      (Pause in the proceedings.)

6          THE COURT:  Okay, all right.  Well, let's hear

7  from Mr. Sbaiti.

8          Thank you.

9          MR. ALIBHAI:  Thank you, Your Honor.

10          MR. SBAITI:  Your Honor, we recognize that we have

11  the sword of Damocles of the *Just Energy* opinion hanging

12  over our heads.  A lot of our arguments, I believe, look to

13  the gaps in the reasoning of *Just Energy*, and a lot of our

14  arguments try to fill those gaps with the understanding that

15  a lot of the arguments we think should have been made to the

16  5th Circuit were not.  So, as Your Honor pointed out, they

17  were only deciding the arguments and the allegations before

18  them.

19          I think the first thing that's really important to

20  understand that was not really before the 5th Circuit is the

21  PUCT's own statements about what its order actually was and

22  what it wasn't.  And for that, we looked to a couple of

23  places.  We actually looked to the PUCT's arguments in *Just*

24  *Energy* at the Bankruptcy Court level when they moved to

25  dismiss themselves out, for example.  And what they argued

1   there was "We have nothing to do with this.  We just issued

2   an order, and it's up to ERCOT to decide what to do with

3   it."  They made the same argument to the 3rd District Court

4   of Appeals in Austin.

5          And I'm going to ask Mr. Colquitt to please put up

6   Slide 11.

7          There you go, Your Honor.  On Pages 22 through 27,

8   the PUCT argued that "The 3rd District Court of Appeals'

9   power to hear a direct appeal from a PUCT decision is

10  limited to review of competition rules adopted by the

11  Commission," and they cite Section 29001E, which is one of

12  the sections that ERCOT relies on today.  They also say,

13  "The PUC's orders and other actions" -- and orders, by the

14  way, is their italics --

15          MR. ALIBHAI:  Your Honor, I don't mean to

16  interrupt, but I do want to object because this is a Motion

17  to Dismiss issue.  This is outside the pleadings.  These are

18  documents they've attached to a response.  They're improper

19  for consideration in connection with a Motion to Dismiss.

20  We have to look at the four corners of the pleading to see

21  if it raises an issue regarding the filed-rate, *Burford*, or

22  the indispensable party.

23          MR. SBAITI:  Your Honor, under the law, at a

24  Motion to Dismiss level, Your Honor can take judicial notice

25  of other court pleadings.  We actually did cite to this very

1 brief in our Complaint, and the PUCT's position in the

2 Second Amended Complaint, and we expanded upon it.  So, it's

3 incorporated into our pleadings through either direction

4 that the Court would want to go.  We're not treating this as

5 evidence.  To the extent that they argue that what the order

6 is or isn't is a matter of evidence, then maybe an

7 evidentiary hearing before Your Honor decides abstention is

8 warranted, but I don't think we're there.  I think you can

9 just look at this.

10        THE COURT:  I actually have a different -- I don't

11 know why PUC's statements, which I read, by the way,

12 already, that you put in there, affect whether we should

13 abstain.  I do understand why they could or could not affect

14 the Travis County Court's decision, but why would they

15 affect an abstention decision?

16        MR. SBAITI:  So, stepping back a bit, Your Honor.

17 Why this is relevant?  I think it's relevant in two ways.

18 One, one of the biggest issues under *Burford* abstention,

19 three of the factors have to do with whether there is state

20 interest, whether there is a state forum that is going to

21 effectuate and take care of that state interest.

22        All of the statutes cited by the Just Energy court

23 and all the statutes cited by ERCOT here today have to do

24 with the rules.  And if the PUC's order isn't a rule and

25 isn't a rule that affects us, then what we're limited to is

1 looking for a statute or a provision that says where we have

2 to litigate with ERCOT when they employ that rule, and I

3 think Your Honor was getting kind of to that point in your

4 discussion with Mr. Alibhai.  We're not challenging the

5 validity of the order.

6    And if you actually look at the statute that they

7 cite, Texas Government Code 2001.038, it specifically talks

8 about the validity or applicability of a rule.  So, if the

9 order isn't a rule, then you say, okay, well, then it goes

10 to the protocols.  Well, the protocols, themselves, are

11 rules that are enacted.

12    But if the order doesn't amend the protocols

13 because it's not a rule and only a rule can amend a rule

14 under the Government Code.  You can't amend a rule via

15 order.  There's nothing in the Government Code, nothing in

16 the Utilities Code, nothing in the Admin Code that they've

17 cited or that we could find that says a PUCT order, that the

18 PUCT is, themselves, saying this isn't a rule.

19    And I think Your Honor doesn't have to do anything

20 other than look at their argument, and I think we agree with

21 it.

22    THE COURT:  So, I guess, I think this is simpler

23 than that, and maybe it's my simplicity that's getting in

24 the way.

25    If you sue ERCOT for breach of contract in the

1  Travis County District Court alleging that they misapplied

2  the protocols, why do we need to worry about the Government

3  Code?

4          MR. SBAITI:  Because Your Honor could hear that

5  argument here, I guess, is the point I was making.

6          THE COURT:  Forget that question.

7          MR. SBAITI:  Yeah.

8          THE COURT:  I've got a 5th Circuit opinion that

9  says, "Go to Travis Court," I think -- County.

10          MR. SBAITI:  Uh-huh.

11          THE COURT:  Why do I need to worry about the fact

12  that you want to jump through eight hoops to get there when

13  I think you can just go sue them in Travis County Court

14  under a normal breach of contract claim?  That solves

15  everybody's problem.  You have an easy forum to go to,

16  they're amenable to service in Travis County, you can sue in

17  Travis County, 5th Circuit said, "Go to Travis County."  I

18  don't need to worry about the Government code.

19          Why do I need to worry about it?

20          MR. SBAITI:  Because the Government Code is how

21  they're arguing that there's a mandatory state forum.

22          Now, I think what Your Honor is saying, "Well,

23  there's an available state forum."

24          THE COURT:  Right.

25          MR. SBAITI:  And, and --

1           THE COURT:  You're telling me maybe I shouldn't

2    abstain there but --

3           MR. SBAITI:  That's where I was going with it.

4           THE COURT:  But if I do abstain, you have a

5    readily available forum, right?

6           MR. SBAITI:  Yes, Your Honor.  I mean, obviously,

7    we can go file a lawsuit for some or all of the relief

8    there, but your --

9           THE COURT:  I'm talking only this narrow question

10   is what I'm thinking, I'm saying.

11          MR. SBAITI:  And that's why I wanted to pick up

12   Your Honor's question for Mr. Alibhai.  Because we keep

13   saying, "No. Well, then go do it," and we keep using

14   pronouns, but I'm not sure what "it" is.  Do we sue for --

15   do we just map on our entire breach of contract claim and

16   just take it to Travis County, and then come back once it's

17   been liquidated?  Do we just -- because the only thing the

18   provisions that they cite say is that, well, you just go sue

19   for a dec action but what does that dec action specifically

20   asking, and is it asking enough?

21          And the fact of the matter is that the dec action,

22   once again that they're saying is authorized, only looks at

23   the applicability or challenging a rule that's been

24   implemented.  And if you actually read that statute, which

25   is .038, that's the dec action authorization for us to go.

1    And I'll get to the actual SFA in a moment, but the dec

2    action statute that says, "This is where you can sue for a

3    dec action," it actually looks -- and this is what the PUC

4    argued in the *Illuminant* 3rd District appeal that we were

5    just referencing is that that only applies to currently

6    enacted statutes because it uses the present or the future,

7    because the condition of the dec action is if it interferes

8    or threatens to interfere.  It doesn't look at historical

9    damages claims where the violation of the protocols resulted

10   in some kind of an injury to the Plaintiff.

11           Now, the SFA says, you know, you can sue for

12   breach of contract in State or Federal Court in Travis

13   County.  And the SFA is part of the protocols, which means

14   it was approved by the PUCT under the rule-making or

15   delegated rule-making authority to ERCOT.  So, when we talk

16   about where do I have to bring this breach of contract

17   claim?  It says I can bring it to Travis County, State or

18   Federal Court.  There's nothing in any of the regulations

19   that say we have to be in Travis County District Court.

20   None of those arguments were presented to the *Just Energy*

21   court, and I think Your Honor doesn't have to follow *Just*

22   *Energy* for a few reasons we raise in our brief.

23           I can understand if Your Honor -- I understand

24   Your Honor's point.  If I'm misunderstanding it, please

25   correct me, but your question kind of assumes, "Well, what's

1   the big deal if I abstained or stay the case while you go to

2   Travis County District Court and then come back?"  I think

3   Your Honor has -- you know, as the Supreme Court and the 5th

4   Circuit said, you know, when you have jurisdiction, you're

5   supposed to exercise it.  I think there's efficiencies with

6   keeping it all here and all in one court.

7          And I'd like to talk for a minute, Your Honor,

8   about the differences between *Just Energy* and our case for a

9   moment.  The first thing we bring up, which they don't

10  really address, is that that was a Chapter 15 case that was

11  seeking nothing but declaratory judgment relief, and under

12  *Quackenbush*, you can abstain under *Burford* if you have

13  discretion to deny relief, which Chapter 15, we understand,

14  gives this Court the ability to do, as does the Federal

15  Declaratory Judgments Act.

16         This is a Chapter 11 case where all of our causes

17  action, save for maybe the subordination claim, are actions

18  at law, which *Quackenbush* specifically said you can't

19  abstain under *Burford*.  You can't dismiss, you can't remand

20  under *Burford*.  They left open the question.  ERCOT

21  characterizes that, well, you're allowed to stay the case.

22  That's actually not what *Quackenbush* held.  *Quackenbush* said

23  we're not going to reach the question of whether *Burford*

24  allows for some lesser included remedy other than a remand

25  or dismissal.

1          And it's true that in the case they've recognized

2   that there was a limited number of abstention doctrines

3   where instead of dismissing or remanding the case,

4   *Thibodeaux* abstention is where the Supreme Court approved

5   staying the case while the State Supreme Court decided the

6   thorny undecided issue of state law.  But if you read the

7   *Thibodeaux* case, it specifically said that staying the case

8   means there has to be a promise of -- first of all, there

9   has to be a widely disputed, open question of state law for

10  the Supreme Court to answer, and then they held that the

11  District Court is going to oversee and make sure that -- the

12  word "prompt" is in there about four different times,

13  prompt, quick, expeditious, those types of adjectives --

14  that the District Court had to oversee the prompt

15  disposition of the State Court.  And if there wasn't going

16  to get a prompt disposition, then they had to take it back

17  and decide it.

18          I bring that up for a couple of reasons, Your

19  Honor.  One, we use the word abstain a little broadly.  I

20  think if Your Honor was going to stay some -- I think Your

21  Honor can stay some and not the entire because *Thibodeaux*

22  says nothing about, no case that approved staying an action

23  for comity reasons says you have to do all or nothing.  And

24  secondly, I think *Just Energy* implied similarly that the

25  Bankruptcy Court could decide what to stay and what not to

1  stay, or what not to dismiss or remand.  They didn't give

2  much direction there.

3           THE COURT:  So, let me ask you this, and I'm going

4  to simultaneously ask it to Mr. Alibhai.  If you were to

5  file a lawsuit for a dec action regarding the validity of

6  the amount of the invoices --

7           MR. SBAITI:  Yes.

8           THE COURT:  -- and the State Court were to rule

9  non-substantively on that, that it could not grant dec

10 relief, can I then terminate my abatement and decide it?  In

11 other words, if you get stuck in a box as a result of courts

12 bouncing this thing back and forth to one another --

13          MR. SBAITI:  Right.

14          THE COURT:  -- can I be a safety valve?  I

15 actually think the State Court will.  I understand you're

16 posing this problem, I think, in good faith.  I don't think

17 it's going to happen.

18          MR. SBAITI:  Right.

19          THE COURT:  But if that's what did occur, isn't it

20 a pretty good safety valve to simply have abstained and not

21 dismissed, and leave it open to come back here?  Because the

22 5th Circuit certainly wasn't contemplating in *Just Energy*

23 that somebody went to State Court and there was no remedy.

24          MR. SBAITI:  Which is what's a little strange

25 about the decision, Your Honor.

1          THE COURT:  Right.

2          MR. SBAITI:  The thing that the District Court --

3    I'll answer your question picking up on the *Thibodeaux*.

4    Given what *Thibodeaux* said, not only do I think Your Honor

5    could be a safety valve, I think *Thibodeaux* would require

6    you to kind of be a safety valve.

7          THE COURT:  Right.

8          MR. SBAITI:  I think it says you need to be, you

9    need to oversee it.  And however much administration that

10   actually involves, I really don't know but it seemed to be

11   what they were implying.

12         The reason I brought that case up though is that

13   *Thibodeaux*'s the only abstention that allowed a court to

14   stay.  Every other court that dealt with *Burford*, that dealt

15   with facts similar to ours, denied abstention because there

16   wasn't an injunction to a state agency or they weren't

17   supplanting state agency rule-making processes or

18   procedures, or a judicial review of those state agency rule-

19   making procedures.

20         THE COURT:  Yeah, look, I mean, we should all be

21   upfront about this.  ERCOT is this unusual animal out there,

22   right?  And so, the 5th Circuit in *Just Energy* is trying to

23   figure out what is it, and they don't ever say whether it's

24   -- you know, and I guess that's up to the 3rd Court now, but

25   they don't really say --

1          MR. SBAITI:  Right.

2          THE COURT:  -- that the sovereign immunity is at

3    the 3rd Court, which I assume will determine whether it's a

4    governmental agency or not, but maybe there's a way to

5    decide that without even deciding that question.

6          MR. SBAITI:  Right.

7          THE COURT:  5th Circuit doesn't really say what

8    ERCOT, what round or square hole it fits in.

9          MR. SBAITI:  Fair.

10          THE COURT:  They do say the proper way to do this,

11    and I don't know why.  From a timely point of view, I can't

12    wait to see what they do to figure out whether I want to

13    dismiss this or not.  I can simply abstain, hold, and be

14    sure you get a remedy.  The remedy may be no, by the way.

15          MR. SBAITI:  Right.

16          THE COURT:  And no is a perfectly fine remedy, but

17    if the remedy is, "We can't take this up in a declaratory

18    judgment format" --

19          MR. SBAITI:  Right.

20          THE COURT:  -- then we'd come back.  I hadn't

21    thought about doing that before I came out here, but I'm

22    respecting your argument.

23          MR. SBAITI:  And I think, Your Honor, that is the,

24    for lack of a better term, that's the limit of what the

25    Court could do, would be to stay, as Your Honor has

1    suggested.  *Burford* doesn't allow the Court to dismiss or

2    remand, which is really the crux of our argument on that

3    issue.

4          And ironically, the fact that there's advocacy

5    that whether or not this is a proper rate is subject to

6    *Burford* stay, or some kind of a stay or abstention for a

7    District Court in Travis County to decide, undermines,

8    obviously, the filed-rate doctrine argument because they'll

9    decide whether it's a proper rate, to begin with.  That's on

10   their way to deciding the question that Your Honor's

11   suggesting they should take up as a dec action.

12         And so, both of those arguments I don't think can

13   co-exist, not here and not there, because there's other

14   reasons why the filed-rate doctrine doesn't apply.

15         Getting back to the differences with *Just Energy*,

16   Your Honor, they have Chapter 15.  So, *Quackenbush* means you

17   can't dismiss.  The second difference is, Your Honor, there

18   was no proof of claim filed in *Just Energy*.  Whereas, here,

19   ERCOT came to Your Honor, filed a proof of claim, and

20   Section 502 says the Court shall decide the claim and the

21   amount.

22         Now, maybe that doesn't interfere.  It seems to be

23   to preclude jurisdictionally a District Court deciding -- or

24   excuse me -- the District Court in Travis County deciding

25   it, but it's also a difference that they just didn't have to

1   contend with in *Just Energy*.  You know, Griddy accepts the

2   PUCT's characterization of its own order --

3            THE COURT:  So, just to be clear --

4            MR. SBAITI:  Yeah.

5            THE COURT:  -- I don't think there's a conflict in

6   that.  I think of a personal injury claim.

7            MR. SBAITI:  Uh-huh.

8            THE COURT:  Some other court can liquidate a claim

9   for state law purposes.  The dec action could say this is a

10  valid or not valid implementation of the rule or the order.

11           MR. SBAITI:  Right.

12           THE COURT:  But if you were to then prevail on the

13  force majeure issue in the claim allowance process, we could

14  say, "You know what?  It was $X million according to the

15  State Court, but force majeure precluded its application,"

16  or something of that nature.

17           MR. SBAITI:  Right.

18           THE COURT:  So, I don't know that it's

19  inconsistent to allow the State Court to issue a dec action,

20  but we would still hold the objection to claim here.

21           MR. SBAITI:  Okay.

22           Another difference, Your Honor, is that Griddy --

23  you know the PUCT's characterization of its orders, as I

24  mentioned, is a big distinction between here versus Griddy.

25  It's the PUCT saying its order and showing the statutory

1   reasons why its order isn't a rule subject to the rule

2   challenge statutes at least should be given some weight in

3   terms of whether or not the Court abstains, or to what

4   degree the Court abstains and what the Court abstains for,

5   Your Honor.

6           And finally, this breach of contract, there's just

7   not a mandatory state forum, save for a choice of venue

8   clause in the SFA.  And I think that's a huge reason why

9   *Burford* abstention just simply doesn't apply.

10          Now, I hear Your Honor's point.  Well, okay.  So,

11  maybe it's not *Burford* abstention.  Maybe Mr. Sbaiti's

12  getting caught up in the semantics, but what *Quackenbush*

13  very specifically pointed out is they were not going to

14  reach -- even if the elements of *Burford* were met, whether

15  that would be a basis to even stay the case.  So, we are

16  going to be making a little bit of law here because *Just*

17  *Energy* doesn't fall under the *Quackenbush* line of cases

18  because there's not much discretion.

19          So, it's going to be a new question for the 5th

20  Circuit if it gets up there whether or not meeting the

21  *Burford* factors allows a District Court to stay a case

22  pending some kind of state decision-making.  Your Honor may

23  have other powers to do so, you know, for whatever reason.

24          I say all that to give Your Honor an out.  Or the

25  extent Your Honor's looking at "Well, authority do I have

1   and not have, you know, and how much can I do," I present

2   that to show there's a rubric where *Just Energy* isn't nearly

3   the weight on the chest to the Court that ERCOT has

4   presented it to be or that it may seem to be at first blush.

5          In terms of the effects that keep getting argued

6   about, "Well, if Your Honor were to decide it, it would

7   wreak havoc," Your Honor, there's just too much empirical

8   against that. Really as a demonstrative showing, we

9   attached as part of our exhibits the trial transcripts from

10  the *Brazos* case where 70 percent of the issues that we raise

11  were litigated there and some other issues were litigated

12  there that we don't even raise about the fineries of how the

13  rate was actually set or manipulated, which we don't

14  actually raise as part of our Complaint. They were actually

15  litigated in front of Judge Jones, and my understanding is

16  Your Honor stepped in, I think, midtrial to mediate that

17  case.

18          So, the fact that you've got a trial that's

19  already occurred or mostly occurred outside of the Travis

20  District Court and settled, and the whole situation didn't

21  crumble kind of brings me to the next point about *Burford*

22  abstention, the limits we believe of the abstention argument

23  in this Court, which falls under *NOPSY*, which is the New

24  Orleans case that the Supreme Court decided, that Justice

25  Scalia decided.

1          And the argument there, Your Honor, was very

2     simple.  What *NOPSY* held is 491 US 350, it says, "There's no

3     contention here that the Louisiana Court's review involves

4     anything other than a judicial act.  That is not the making

5     of a rule for the future, but the declaration of NOPSY's

6     rights vis-à-vis the counsel on present or past facts and

7     under laws that already exist."

8          And they go on to say, on Page 363, "There were no

9     inquiry beyond the four corners of the subject order is

10    needed."  They name the order.  I'm just trying to be

11    faster.  When you don't have to look beyond the four corners

12    of the order to decide the issue, abstention isn't proper.

13         So, they went beyond even where we've alleged.  We

14    don't think you ever have to look at the order because the

15    point is that all we have to look at are the protocols which

16    are part of the contract.  And *NOPSY* I think very succinctly

17    put the point, which is when everything is backward-looking,

18    when there's not an injunction to stop an agency from doing

19    its job, from passing a rule, when they're not interfering

20    with the ongoing rule-making, which was the issue at issue

21    in the *Burford* case, itself, that abstention is completely

22    improper.  It's a judicial act, and Your Honor can decide

23    judicially the facts, which aren't changing as Mr. Alibhai

24    pointed out, and the law which was applicable at the time.

25         The protocols, in February of 2021, are ensconced

1  there.  We have access to them.  The contract adopts them as

2  part of the contract.  And really, this becomes really

3  nothing more than a simple, straightforward breach of

4  contract case.  Your Honor doesn't have to send it out of

5  the Court, Your Honor doesn't need to do so, and there's

6  nothing that requires Your Honor to do so, which is really

7  the point I'm driving at there.

8         So, I think the limits of *Burford* abstention being

9  fairly clear, and I can walk Your Honor through the

10  legislative provisions if you'd like, but I mean, I think

11  we've made the point.  They're cited in our brief, but I'm

12  happy to walk Your Honor through.

13         But if you look at them, all the ones that require

14  something all have to do with challenging a rule, and we're

15  not challenging a rule.  The ones that talk about a conflict

16  with, excuse me, resolving a conflict with ERCOT, which is

17  under the Utility Code, is actually permissive.  It says the

18  PUCT may decide disputes with ERCOT, and that's 391-151-D46.

19  It says, "The Commission may resolve disputes between an

20  affected person and an independent organization, and adopt

21  procedures for the efficient resolutions of such disputes."

22         This is the only thing in the Utilities Code that

23  speaks to the PUCT having any jurisdiction or any oversight

24  over the resolution of a dispute with ERCOT.  The only thing

25  that goes to it after that is two things.  The first is

1  16 Admin Code 22.251, which again is permissive.  It says,

2  "This section prescribes the procedure by which an entity

3  may appeal a decision made by ERCOT, or any successor-in-

4  interest."  It doesn't require anything and what it says is

5  that the first thing you have to do is you have to raise

6  your dispute to ERCOT.

7           And indeed, ERCOT has an ADR provision, and the

8  contract says, "The parties shall first attempt alternative

9  dispute resolution."  So, ERCOT filed its claim, it didn't

10 attempt alternative dispute resolution, but the reason I

11 bring up the ADR provision is because it shows very clearly

12 that resolving disputes between ERCOT and any market

13 participant doesn't involve the PUCT, doesn't involve any

14 new rule-making, and doesn't involve anything out of the

15 ordinary.

16          For example, it's Protocol 20, and Protocol 20.5.3

17 basically says, "Once you're in ADR, you go to mediation."

18 And then it says, and 20.5.6 says, "Once you're in

19 mediation, you know, you follow the mediation procedures."

20 And 20.6.2 says, "If you can't reach an agreement, then you

21 can either go to the PUCT or you can go to a government

22 authority," and a government authority includes any federal

23 or state body, well, it says, with jurisdiction.

24          So, even under the PUCT's own promulgated rules

25 and the contract that they promulgated, which brings in the

1  protocols, there's nothing that requires this case to go

2  anywhere else other than some judicial authority to decide

3  the specific dispute.

4          And what's even more interesting, because there's

5  this parade of horribles that's been bandied about, both in

6  front of *Just Energy* and here, but nobody brought up the

7  fact that this ADR provision, if there is a resolution, has

8  one of two options.  You could either do what's called a

9  resettlement, which they litigated heavily in the *Brazos*

10  case, and resettlements where they reset the price for

11  everybody, but then 20.10.1-2 says if a resettlement is not

12  practicable, then they can just do an individualized

13  invoicing or resolution process with the counterparty, which

14  means you don't have these market-wide effects necessarily.

15          And nothing was required to go to the PUCT.  It

16  can all be resolved just like *Brazos* was on a one-to-one

17  basis just like any other breach of contract situation is

18  resolved.

19          So, I lay all that out, Your Honor, because I

20  understand -- you know, and we obviously understand *Just*

21  *Energy* came out right in the middle as we were briefing

22  everything.  And so, we think it has limited application

23  here for a few reasons.  We think that the arguments that

24  we've brought up simply weren't presented there, and we

25  think it would just be a completely different story if this

1   case were to be examined with all the arguments and the

2   facts, as opposed to the *Just Energy* case.

3          Your Honor asked -- sort of going back to the

4   question on the filed-rate doctrine, Your Honor, it's

5   interesting that they bring up *TCE v. TXU* because what *TCE*

6   *v. TXU* held was an argument by analogy.  The first argument

7   we brought up though is that all their cases have to do with

8   the abstention doctrine that is imposed by the Federal

9   Courts for FERC, but we pointed out in our response, FERC

10  doesn't apply.  This is not a federal agency, it's a state

11  agency, and the filed-rate doctrine is a federal

12  commonwealth defense to a claim when there's a federal

13  agency involved.

14         You have to look towards the state jurisprudence

15  of the filed-rate doctrine, and we pointed out why it

16  wouldn't apply.  The reply brief says, "No, no, no, no.  We

17  think the federal filed-rate doctrine applies."  So, they're

18  not even invoking the state version of the filed-rate

19  doctrine under Texas law.

20         And the difference, the main difference is under

21  Texas law, a filed-rate doctrine only applies or doesn't

22  apply in two circumstances.  You can challenge the

23  reasonability of the rate, which is one of the arguments

24  that they make, so you don't have this ironclad filed-rate

25  doctrine being applied, and the second thing is that you

1    have to point out, you have to show that you actually

2    charged the filed-rate.  We actually do cite a FERC case to

3    support that particular argument because it applies in the

4    federal context as well, and that's the *Columbia II* case

5    that we cite.  And that was a FERC case, and what the DC

6    Court of Appeals held was you, FERC, can't retroactively

7    change the rates.

8            When you have a filed-rate, you can't via order

9    change the filed-rate doctrine, you can't via order waive

10   the filed-rate doctrine.  Now, what they held was the act of

11   charging something other than what's in the filed-rate is,

12   itself, a violation of the filed-rate doctrine, which is

13   ironic because that's kind of our argument here.

14           Going back to *TCE v. TXU*, what the 5th Circuit

15   held -- they weren't differentiating federal versus state.

16   They weren't looking at the fineries.  They just said it's a

17   filed-rate, and we're good to go.  But what they argued is

18   that by analogy, because FERC has a filed-rate defense, we

19   think Texas would have one because FERC oversees the market

20   and ERCOT oversees the market for filed-rates and

21   administers it, therefore an ERCOT-issued rate must be a

22   filed-rate.  Great, but how does ERCOT do that?  It's

23   through the protocols.

24           And if you look at the language applicable to the

25   protocols that we cite under *CenterPoint Energy*, the

1  protocols are the rules enacted to govern the market for

2  price setting for electricity, and for energy generally.

3  So, those protocols are the equivalent of a tariff.  If you

4  look at the definition of a rate that we cite from the

5  Utilities Code, the rate is not just the number.  It's also

6  the rule or the formula for determining what the rate would

7  be.

8        So, the protocols, Protocols 4, 5, and 6 all go

9  into how the rate is supposed to be calculated at different

10 points in time, the mix of variables that are supposed to go

11 in there.  Those protocols, as I don't think there's a

12 dispute, and maybe there's other ones that apply, but those

13 protocols are tantamount to the tariff, to the filed-rate

14 that ERCOT now has to live under.  So, the defense that they

15 want to say is "As long as our market rate was set vis-à-vis

16 the protocols, we have charged a filed-rate and therefore,

17 we win," but if they didn't, then the filed-rate doctrine

18 doesn't apply.  They don't even get there.

19        And actually 14th Court of Appeals, I believe, if

20 I could get there for a moment -- it's *PUC v. Constellation*

21 *Energy*, it's actually the 3rd Court of Appeals, it's 351

22 S.W.3d 588, that's the court that said the ERCOT protocols

23 are, "The rules that provide the framework for the

24 administration of the Texas electricity market. They have

25 the force and effect of statutes."  That phrase is very

1  interesting because that's the exact phrase that every one

2  of their FERC cases that they cite for the filed-rate

3  doctrine uses to describe the filed-rate.  Once a rate is

4  filed and proofed by FERC, it has the force and effect of

5  law.  That's the argument.  And so, the parallel can't be

6  ignored.

7         *CenterPoint Energy v. The Railroad Commission*, 208

8  S.W.3d 608, specifically held, "The Legislatures recognize

9  their rate may consist not merely a fixed dollar amount, but

10 may instead be a rule affecting the charge, a term

11 contemplated the use of variables."  That's a direct quote.

12        They also held that a regulatory agency cannot

13 retroactively alter the cost adjustment mechanism nor can it

14 reject calculations on the theory that the method of

15 calculation, itself, is not just and reasonable because the

16 rate rule is the filed-rate.  So, ERCOT's rules for how to

17 determine the filed-rate are the filed-rate in this instance

18 if we're going to talk about the filed-rate doctrine.

19        But they also held, finally, that the filed-rate

20 doctrine does not preclude a review based upon the charge

21 that a utility misapplied the rule, which is exactly, as

22 Your Honor pointed out, what we've alleged.  We're not

23 saying that the rule properly implemented was an

24 unreasonable rate.  That would run us into the buzz saw of

25 the filed-rate doctrine.  We're saying the rule that's there

1   to calculate the rate was misapplied or overlooked entirely,

2   which is the nature of the argument.

3          So, the filed-rate doctrine goes away, and it's

4   ironic, Your Honor, because the filed-rate doctrine actually

5   becomes, in essence, our argument against their proof of

6   claim, which can be a basis for them to wholesale lose their

7   proof of claim without having to decide how much their claim

8   should have been.

9          They have the ability, as we saw in *Brazos*, they

10  have the ability to rerun that software taking out the

11  variables to see what a purely market rate likely would have

12  been, or a pretty close approximation.  They have the

13  ability to do that internally.  They chose not to.  They

14  chose instead to file a proof of claim based upon a rate

15  that even their own monitor says violated the protocols.

16         The IMM report to the PUC specifically says, "This

17  violates the protocols.  They shouldn't have done this.

18  It's wrong. They should go back and reset it."  And they

19  specifically focused on those last 33 hours.

20         So, given that they didn't -- and I don't hear

21  anybody saying that they did apply the protocols.  In fact,

22  in the testimony from the *Brazos* trial, at least two of the

23  ERCOT witnesses admitted, "Yeah, we didn't apply our

24  protocols."

25         THE COURT:  Yeah, I've let you vary pretty far,

1   given Mr. Alibhai's objection.  I think we're now so far --

2               MR. SBAITI:  Sorry, Your Honor, I don't mean to

3   get into it.  I --

4               THE COURT:  -- so far out of the Motion to Dismiss

5   that I'm going to go ahead and ask you to get back on track.

6               MR. SBAITI:  Yes, Your Honor, I apologize for

7   going far afield if I did.

8               I only bring all that up, Your Honor, because

9   there's a lot of factual arguments about what would happen

10  if Your Honor were to take this case and Your Honor were to

11  decide it here, this Court were to decide all of these

12  issues.

13              And the evidence is otherwise is really my only

14  point.  The evidence of what would happen, the interference

15  is nonexistent as demonstrated by the history of this case.

16              And getting back to whether Your Honor should stay

17  it and oversee it, I also want to point out -- Mr. Alibhai

18  pointed out, you know, that the 3rd District is going to

19  decide that issue that we've been quoting from, the

20  *Lumeninant* issue.  But if you look at the date of briefing,

21  Your Honor, that briefing was done almost a year and a half

22  ago.  That's no prompt resolution.  And if the argument

23  goes, "We're going to go to the District Court in Travis

24  County, then we're going to go up to the 3rd District Court

25  of Appeals, and then we're going go up to the Texas Supreme

1   Court," that's not going to be a prompt resolution of the

2   underlying issues as the language in *Thibodeaux* held.

3          Your Honor, I think we've briefed pretty well why

4   the, Your Honor knows why the PUCT is not a necessary party.

5   So, I'm not going to beat that dead horse.

6          If Your Honor has any more questions, I would just

7   end with if Your Honor is going to -- I don't think Your

8   Honor needs to abate the case.  The only thing I would

9   suggest to Your Honor is, if Your Honor's going to tell us

10  to go to District Court in Travis County, or Federal Court

11  depending on what we're looking at, then I think we're in a

12  position where I don't think anything here needs to be

13  stayed because there's still discovery to be done on the

14  actual force majeure claim.

15         As Your Honor pointed out, the force majeure claim

16  is not the claim that goes back.  I do want to pick up the

17  argument on the protocols for taking away the customers, for

18  moving the customers over to a polar.  Mr. Alibhai's

19  argument was a hypothetical.  I'd like to address that issue

20  in the actual circumstances that was there.

21         When Griddy Energy asked for some of its customers

22  to be sent over to the providers of last resort, the polars,

23  neither the PUCT nor ERCOT obliged them.  It wasn't until

24  they had terminated the contract that they actually moved

25  everyone away, when there was no more need to move them

1   away.  The reason that contract was terminated is because

2   there were unpaid bills.  And once there was no contract, as

3   Your Honor held in the *Nelms v. TXU* case, once there was a

4   termination, my client lost all property rights in those

5   customers.  They had to be rearranged per the protocols.

6            So, the actual sequence that we're dealing with is

7   very different than the hypothetical of, well, there could

8   have been other reasons why they would have moved Griddy's

9   customers away.  They didn't.  They only did it after the

10  termination, and the rationale that they give in this Court

11  is because there was a termination.  And therefore, the

12  issue is it.

13           THE COURT:  All right, thank you.

14           MR. SBAITI:  Thank you, Your Honor.

15           THE COURT:  Mr. Alibhai?

16           MR. ALIBHAI:  Can Ms. Curry be the presenter,

17  again, Your Honor?  And I just want to show a couple slides

18  and look at the *Just Energy* opinion to clarify something

19  Your Honor brought up, the sovereign immunity issue.

20           THE COURT:  Ms. Curry is back.

21           MR. ALIBHAI:  Thank you.

22           The sovereign immunity issue relating to ERCOT and

23  the PUCT's exclusive, whether the PUCT has exclusive

24  jurisdiction, whether ERCOT's a governmental unit was argued

25  at the Supreme Court of Texas last month.  So, a decision is

1    expected on that issue by the end of this term.  So, June or

2    July potentially.

3          So, that's a different issue at the Supreme Court

4    of Texas.  This issue in *Luminant* -- and this is exactly why

5    I said to Your Honor, "I'm not going to stand here and

6    presuppose what their Complaint would look like," because if

7    they want to make a rule challenge, they can make a rule

8    challenge.  If they want to file a declaratory judgment

9    action, they can file that.  If they want to bring a breach

10   of contract action, they can bring that.

11         There's a number of different avenues and routes

12   that are available to somebody who's a market participant to

13   make a challenge of some type, which one you choose is up to

14   you.  But the idea that that's not required to be in State

15   Court is absolutely false, absolutely false.  It is not just

16   Government Code 2001.038 that relates to rules that say

17   that.  The *Just Energy* opinion specifically discusses this.

18         So, can we put the opinion up so that I'm looking

19   at the same version?

20         So, the first thing I want to point out is this

21   whole -- that's a lot of scrolling.  Sorry, it's Page 6 of

22   14 under Roman Numeral I.  This whole thing about you can't

23   change a rule, you can't change an order, first of all,

24   that's not an issue that we should be getting into.  That's

25   exactly the types of issues that *Just Energy* says should be

1  decided by the State Court.

2         But the 5th Circuit has now said that ERCOT

3  determines market clearing price unless otherwise directed

4  by the PUCT, its state regulator.  That is federal law

5  citing a rule, the Texas Administrative Code Section

6  25.501(a).  It could not be more clear.  I don't want to get

7  into this whole issue of whether the PUCT orders are rules

8  or not rules.  The 5th Circuit's spoken to this issue.  The

9  protocols speak to this issue.  And speaking of the

10 protocols, if we go to Page 12 of 14 of the opinion when the

11 Court was discussing the fifth factor -- it's on the fifth

12 factor.

13         THE COURT:  Where it says, "Texas selected the

14 Travis County District Court"?

15         MR. ALIBHAI:  Correct, and what they do there,

16 Your Honor, is they cite ERCOT protocols from Section 6,

17 Section 9, 20.  They cite the Utility Code.  They cite the

18 Administrative Code.  The point being that there are a lot

19 more provisions that require these types of disputes to be

20 brought in Travis County District Court.  It is not just the

21 one that I showed you.  That is dealing with the validity or

22 applicability of the rule.

23         But again, the 5th Circuit has said, "must be

24 filed with ERCOT in the first instance with the right of

25 appeal to PUCT and then the Travis County District Court."

1  It depends on what kind of challenge you bring as to where

2  you have to file it.  Some have to be brought in the 3rd

3  Court of Appeals, some have to be brought with Travis

4  County, some have to be brought with PUCT.

5           Again, not our issue, not for you and I to decide

6  where they're going to file their Complaint or what kind of

7  Complaint they're going to file.  The point is they have to

8  go file something in State Court, and it's got to be in

9  Travis County District Court or whatever other agency review

10  that they're going to seek.  And as they pointed out, the

11  SFA in Section 11(a) has a mandatory provision about the

12  courts in Travis County.

13           So, with respect to however they want to challenge

14  the invoices, that's exactly what was at issue in *Just*

15  *Energy* is that the invoices were inflated or too high.  And

16  we argued the filed-rate doctrine, and we argued *Burford*,

17  and we argued the indispensability of the PUCT, we argued

18  our sovereign immunity.  The 5th Circuit decided to write on

19  *Burford* abstention, but they pointed out that those issues

20  in Footnote 8 of the opinion, there are other unsettled

21  state law matters including ERCOT's affirmative defense that

22  it's entitled to the immunity and the PUCT, is it an

23  indispensable party with the right to intervene.

24           They think those are unsettled state issues as

25  well.  I don't know why they think they're unsettled, but

1  regardless, they think that and they point out that also

2  supports an abstention.

3         And so, the entire point of the abstention and the

4  stay would be not to go forward with discovery, would be to

5  do whatever the Court that's going to decide the central

6  issue, whether the invoices were charged pursuant to a

7  lawful filed-rate -- that's exactly the question imposed in

8  the *Just Energy* opinion -- and then decide whether

9  anything's left to do here, not to be in parallel tracks,

10  and Footnote 11 that I pointed out supports that.  This

11  Court stops, they go forward if they want to, and then this

12  Court goes forward after the answer from the State Courts.

13         And with respect to the issue you raised about,

14  you know, the State Court deciding or not deciding the

15  issue, I mean, they can't go file an improper petition.

16  They got to file the right thing.

17         THE COURT:  Right.

18         MR. ALIBHAI:  And I don't know that it's a

19  declaratory judgment.  Again, that's why I say it's not our

20  issue to decide here today what Griddy decides it needs to

21  file, and where it files it, and how it does it.  It's clear

22  either from the protocols, from state law, and from the *Just

23  Energy* opinion that there are routes that require a State

24  Court to make those determinations in the first instance.

25         THE COURT:  Thank you.

1          MR. ALIBHAI:  With respect to this argument

2     they've made about *Quackenbush*, I think *Quackenbush*, itself,

3     is very clear that you do stay.  I mean, we're not asking

4     for a dismissal under *Quackenbush*.  And to the extent that

5     they believe that this quote from *Quackenbush* that we cite

6     is not clear, the 5th Circuit has said *Quackenbush* noted the

7     Court could stay an action pending resolution of issue

8     relevant to the federal case if the *Burford* doctrine called

9     for abstention, and that's what we're asking for.  We're

10    asking for abstention under the *Burford* doctrine.  We did

11    ask for dismissal under the filed-rate and PUCT issues, and

12    their defects with accounts, but it's only abstention or

13    stay with respect to the other issues.

14          And at the end of the day, the idea that one

15    market participant could come in and get a different rate is

16    the very concept behind the filed-rate doctrine.  It is

17    non-justiciability and nondiscrimination are the two

18    principles that underlie that.  They're asking to pay zero

19    for electricity that they and their customers used.  That

20    nondiscrimination principle says you don't do that.  You

21    don't get to come into court, and file suit, and get a

22    different rate because you decided to file suit.

23          THE COURT:  I'm going to let you argue that

24    somewhere else.

25          MR. ALIBHAI:  Thank you, Your Honor.

1          THE COURT:  All right, we have jurisdiction over

2    this matter under 20 U.S.C. Section 1334.  This is a core

3    matter under 20 U.S.C. Section 157.  I'm going to do

4    something similar to what I said at the beginning of the

5    hearing, but not exactly what I said at the beginning of the

6    hearing because I've been persuaded really by all Counsel

7    that what I had originally thought was right needs to be

8    modified.

9          There is really little question in my mind that

10   *Burford*, which should be narrowly applied, applies in this

11   case to the question of whether the invoices were issued in

12   the correct amount.  The first *Burford* question is whether

13   the Plaintiff raises state or federal claims.

14         With respect to the one issue that I am going to

15   abstain on, it is totally a state claim as to what the

16   correct rate that could be billed by ERCOT was and the

17   correct amount of the invoices.

18         With respect to whether the case involves an

19   unsettled state law question, absolutely, it is an unsettled

20   state law question.  I mean, it is permeating a number of

21   cases in the Bankruptcy Court and throughout the state.

22   They may, some of them, be on their way to being settled but

23   right now, I think it is unsettled as to whether ERCOT had

24   the authority to do what ERCOT did in implementing the

25   orders issued by the PUCT.

1        With respect to the importance of the State's

2   interest in the litigation, I think the State's interest is

3   high in having this resolved in a manner that is required by

4   law.  I am not finding, however, that this is overwhelming

5   in terms of the determination because that would require a

6   determination as to whether PUC must be involved in the

7   litigation.  That is not a matter for me to decide.  I'm

8   going to abstain and that will be a determination that's

9   going to be made by another Court.  So, number three

10  probably slightly leans in favor of abstention, but not

11  overwhelmingly.

12       The State's need for a coherent policy in the

13  area, I find it's neutral.  Although the State, we can

14  speculate, wants uniformity, the State isn't here.  So,

15  whether this is an area that is likely to repeat itself so

16  that we need a coherent policy, I have no way of knowing.

17  The State, as I understand, changed its regulations, ERCOT

18  has changed its.  So, I don't know whether we need a

19  coherent policy on a go-forward basis.  It's somewhat

20  neutral.

21       Whether there is a special state forum for

22  judicial review, there's a designated court for judicial

23  review and there is the PUC.  I find those favor abstention.

24       Accordingly I'm going to abstain on that one

25  issue.  I am keeping the case.  I'm not going to dismiss

1   those claims.  And I'm keeping all the rest of the case, but

2   I'm abating the entirety of the case.  It makes no sense to

3   me that we're going to force people to spend a huge amount

4   on discovery and argument, and frankly, even the rest of the

5   dismissal portion that has been filed by ERCOT, until we

6   figure out the magnitude of the claim that is being properly

7   asserted here.  That includes, of course, the force majeure

8   issue and how that might or might not have been properly

9   implemented.

10          I'm going to have the parties work on an order to

11  submit to implement this as to form only, and I'm going to

12  tell you what I want it to say generally.  And if you all

13  can't agree, I'll figure that out.  I'm going to give the

14  Plaintiff 60 days to commence an action in a non-Bankruptcy

15  Court to determine whether the invoices were correct or not.

16  They must proceed in good faith, expeditiously to do that.

17  What I'm not doing is saying who needs to be joined.  I'm

18  not saying whether it needs to be a dec action.  I'm not

19  saying whether it ought to be with the PUC or with the

20  Travis County Court.

21          However, a good faith error by the Plaintiff that

22  commences in the wrong place or doesn't join the right party

23  will not mean they haven't complied with my 60-day rule.

24  So, this is not a gotcha situation.  I want it litigated in

25  the way one would normally litigate it in good faith.

1          And I will say, by the way, that the -- going to

2    that question -- the briefing, in this case, was

3    phenomenally good.  And so, it was just first class by all

4    parties.  And that, to me, in the case I don't even need to

5    worry about whether it's going to be good faith.  Counsel's

6    going to try and get it done in good faith.  But this isn't

7    going to be a technical foot fault.  You know, if you make a

8    good faith determination -- this is a hypothetical example

9    -- that you believe the right way to proceed is at the PUC

10   level and it turns out, although that was a good faith

11   attempt, it should have been over in Travis County District

12   Court.  So long as you were proceeding expeditiously in good

13   faith, you're not going to foot fault out.

14          I guess, if you did something that was so foolish,

15   which I don't expect, that it might cross the line into not

16   really being consistent with what a good lawyer would do,

17   maybe I would find something, but it's going to be hard for

18   you to get there especially given, we've never met but who I

19   now know you are.

20          If the state system, the non-bankruptcy system --

21   this also needs to be in the order -- does not or will not

22   issue a substantively ruling on the invoices, then I will

23   reconsider on motion of either party the abstention order.

24          Everything else is retained until the non-

25   Bankruptcy Court rules and it is retained in an abated

1  status.  I will note, for the Record, that what I'm doing

2  not only complies with *Burford,* but it complies, I think,

3  with some of the teachings in *Ultra* with respect to the

4  *Ultra* FERC opinion, where the 5th Circuit requires

5  Bankruptcy Courts to give deference to states on regulatory

6  issues by allowing PUC or the State Court to rule first, and

7  I think this very odd circumstance we're in, I think, gives

8  appropriate deference to the state regulatory authorities.

9         I leave open the possibility -- once the State

10 Court rules, we're not an Appellate Court to the State

11 Court.  That's a State Court issue.  But I leave open the

12 possibility that the amount determined by the State Court

13 may be different than the allowed claim that would occur in

14 bankruptcy.  We gave the example of what might occur with

15 respect, for example, to, yeah, that invoice was proper but

16 the exercise of remedies was improper.

17        And if that occurs, allowance may be a different

18 question, but allowance is, I think, solely within the

19 jurisdiction of the Bankruptcy Court.  So, we're not going

20 to revisit what the State Court did.  We're going to apply

21 what the State Court does or what PUC does, if that's the

22 route that you take, to then determine the allowance of

23 claims in this case.

24        That's the ruling.  I want to be careful about the

25 wording about what needs to occur and the aftermath of that.

1  So, I hope you all can agree on that.  Why don't I give you

2  all until February the 8th?  If you can't agree, if you want

3  a hearing, do that or if you want to submit competing

4  orders, that's fine.  I'm pretty sure you all are going to

5  agree on how to word it.  I don't want to take the risk of

6  just messing it up by me doing it here right now.

7          Does anybody need any clarification on the ruling

8  before we recess?

9          MR. ALIBHAI:  Your Honor, may I ask a question?  I

10  don't know if it's a motion to reconsider in part.  Would

11  the Court allow us to at least proceed on our Claim No. 3,

12  which was the preference action, which I don't think has

13  anything to do with the filed-rate or the other amounts?

14  And then, I think that, at least, would knock one of the

15  things out.  And just to remind Your Honor --

16          THE COURT:  The preference action was for matters

17  that arose when --

18          MR. SBAITI:  So after, in between the termination

19  and the filing of the bankruptcy, they had access to about

20  $3 million, a little over $3 million that ERCOT took.  So,

21  it's within the preference, the 90-day preference period,

22  and really, I mean, I know there are other factors that we

23  can brief but it has nothing to do with the validity of any

24  claim.  It's just a straight preference action.

25          THE COURT:  Was that a security deposit they held

1  or -- I don't remember that part of it.

2          MR. SBAITI:  I'm not sure if it was a security

3  deposit but our argument has been that they basically had a

4  draw, they had to be able to draw down certain lines of

5  credit --

6          THE COURT:  Right.

7          MR. SBAITI:  And so, that's what they did.

8          THE COURT:  It's not an unreasonable request at

9  all, but can I get you to put it in writing --

10         MR. SBAITI:  Sure.

11         THE COURT:  -- just so that I can focus a little

12 more on his answer to that as well?

13         MR. SBAITI:  Yes, Your Honor.

14         THE COURT:  But feel free to file that Motion to

15 Reconsider if you want.

16         MR. SBAITI:  Will do.  Thank you, Your Honor.

17         THE COURT:  I'm going to go ahead and issue

18 though, I want to issue the order I'm announcing.

19         MR. SBAITI:  Understood.

20         THE COURT:  And then if you want to file a Motion

21 to Reconsider, I'll give you a chance to think about that as

22 well, or if you all can agree on that, you can put it in the

23 order.

24         MR. SBAITI:  Okay.

25         THE COURT:  The only thing that sort of strikes me

1    is if it is going to result in an exchange of funds because

2    it would simply allow them to still keep it until we've

3    resolved everything else, not much point.  So, if it would

4    result in an exchange of funds though, it might --

5              MR. SBAITI:  Okay.

6              THE COURT:  -- might be worth thinking about.

7              MR. SBAITI:  Thank you, Your Honor.

8              THE COURT:  Okay, thank you.

9              Mr. Alibhai?

10             MR. ALIBHAI:  I had a clarification question on

11   the order.  I wanted to confirm before I put it in the

12   order, and I thought I heard this, that with respect to the

13   other issues we've raised --

14             THE COURT:  They're all preserved and abated.

15             MR. ALIBHAI:  That's exactly right.

16             THE COURT:  Right.

17             MR. ALIBHAI:  Thank you very much.

18             THE COURT:  Okay, thank you.

19             I intended to say that.  I may not have said it,

20   but I intended to say that.  That was part of my original

21   ruling I was intending to make.

22             All right, I'm going to move to my next Winter

23   Storm Uri case this morning, unless there's something else I

24   needed to discuss with you all.

25             MR. SBAITI:  No, Your Honor.

1          MR. ALIBHAI:  No.

2          MR. SBAITI:  Thank you very much.

3          MR. ALIBHAI:  Appreciate your time.  Thank you,

4  Your Honor.

5          THE COURT:  Okay, thank you.

6        (Hearing adjourned at 10:45 a.m.)

7                          *  *  *  *  *

8          *I certify that the foregoing is a correct*

9  *transcript to the best of my ability produced from the*

10  *electronic sound recording of the proceedings in the above-*

11  *entitled matter.*

12  */S/ MARY D. HENRY*

13  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

14  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

15  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

16  *JTT TRANSCRIPT #66815*

17  *DATE FILED:  FEBRUARY 15, 2023*

18

19

20

21

22

23

24

25